Case number 226094, 226101, 226102, USA v. Maurice Banks, Brandon Hardison, and Elance Lucas. Argument not to exceed 30 minutes per side. Mr. Bailey, Mr. Eggert, and Mr. Evans, you may proceed for the appellants. May I ask if you all have formally divided the amount of time that you argued? This is a consolidated case. Yes, Your Honor. I believe the order indicated that each of the defendants got 10 minutes and that the government got 30 minutes. So that's how we... It's a helpful reminder. Okay. So this is your 10 minutes. Yes, Your Honor. Good. Thank you. May it please the court. Good morning. John Bailey on behalf of Maurice Burks. As the court knows, I presented nine issues on Mr. Burks' behalf for this court's consideration. It is my current intention to argue the government-to-Batson violation and the government's misconduct in questioning its witnesses at the trial of Mr. Burks. However, I recognize that I am not always very good or even any good at intuiting exactly which issues the court is most interested in hearing about, and I am more than happy to change course at any time, including right now, if there are other issues that the court is more interested in. One general issue, don't we usually address ineffective assistance of counsel in a collateral proceeding, 2255 proceeding? Why should this be addressed here today? I don't intend to address ineffective assistance of counsel, Your Honor. The only time that I know that it came up in the briefing was with regard to the severance issue, in which case the government argued that trial counsel, that's me, waived the issue of severance by not raising it again at the close of all evidence. We filed a pretrial motion. We filed a motion to reconsider. We made a motion again for severance at the end of the government's case, did not make a motion at the end of all evidence, raised that issue in the motion for new trial, and the judge addressed it without saying that it was waived in any way, but the government said that it was waived for purposes of this appeal. And I did say, and I mean, there was no strategic reason. I just forgot to raise it at the end of all evidence. For the fourth time? So that's the only. Do you want to focus on Batson and Brady and the double jeopardy? What issue would you like to begin with? I'd like to begin with Batson, if it pleases the court. Please. The government began its voir dire by asking an individual question to a young female African-American juror. The government asked if the juror would hold the government to its burden of proof beyond a reasonable doubt. The juror said that she would. The government, not satisfied with that answer, followed up and said, would you hold us to beyond any doubt or beyond speculative doubt? The juror asked if the government could rephrase the question. And the government asked a rather long-winded, I would say convoluted question that talked about speculative doubt, any doubt, reasonable doubt, some doubt, and the juror just said yes. The court jumped in and immediately cleared it up, asked the juror if she would hold the government to more than what the court instructed her, and she said that she would follow the court's instructions. No further questions. The next question that the government asked was a question to the entire voir dire panel about their ties to law enforcement. There was not another lead individual question during the government's entire voir dire. This was the only time that they went directly to a witness to ask a general question about the burden of proof. They didn't even ask any more questions about burden of proof at all. The only individual questions after that was when they asked a general question of the entire panel, and a juror would raise their hand and say they had something to say, and there would be individual follow-up questions. This was the only time. So we review the legal application of Batson de novo, correct? But we review the court's ultimate Batson determination with great deference under a clearly erroneous standard. Is that correct? I understand that the trial court is entitled to- How do you meet the decision of the trial courts? What is your best argument that this was? We should not defer, and it was clearly erroneous. Because if the trial court's decision is upheld, granted great deference under these circumstances, the government can always, in each and every case, create a so-called race-neutral explanation for exercising a peremptory challenge on a juror by asking an individual juror a convoluted, confusing question, and when the juror doesn't understand it, they say that's our reason for striking this juror. They've created the reason by targeting that juror and then asking a question. I understand. The government, in its brief, said that the question was, quote, not particularly confusing, end quote. Respectfully, I disagree with the government about that, and I can read the question. I have it right here if you want to hear it out loud. I mean, don't we defer? That's why we're deferring to the trial judge who presumably is reasonably savvy and who can make that observation and say what you said. Look, you didn't ask any other jurors specific questions, and it was a convoluted question, and I don't buy it. I mean, we leave it to the trial judge to make those types of judgments. But when they're wrong, they're wrong, and we count on this court to say that they're wrong, even granting deference if the decision they make is clearly wrong. I mean, one of the things that the government avoids by using this tactic, we all know that one of the ways that you determine whether there's a bad scenario was by looking to whether the same questions were asked of white jurors who gave the same answers, and therefore there's a distinction in the government's action. Well, they avoided that here. Well, was that argument fleshed out before the trial court? So once the government gave its explanation as to why they asked that question, and the burden shifted back to the defense to say, well, court, don't buy that because X. What you're saying now, is that what was said to the trial judge? And did the trial judge then say, no, I don't buy that? Because I didn't see that fleshed out like that in the record. I probably didn't do it as well as I should have. I believe that I said in reading over the transcripts in preparation for this, I believe that I said to the court, they didn't ask any other juror that question, and by that question I mean a question about their ability to hold the government to its burden of proof. They asked no other individual questions about that, much less the convoluted question that it asked of this individual juror. So I believe I did say that. Did I say it as well as I should have? I don't know, Your Honor, perhaps not. But I tried to get across to the court. They targeted this juror, separated her from all of the other questioning of all of the other jurors in this case, and by doing that created what they are saying was a race-neutral explanation. It's not a race-neutral explanation. I mean, I see I'm over my time, but just to finish my answer to Your Honor, Judge Davis, what they are really saying here is this juror was not smart enough to understand the question that we ask, and that's the reason for striking her. They didn't use those words, but that's what they were implying, and that's been wrong, constitutionally wrong for long before Batson. There's a 1970 case from the U.S. Supreme Court long before Batson saying intelligence is not a race-neutral reason for striking a juror, and I apologize for going over my time. You have your two-minute rebuttal. Thank you, Your Honor. Mr. Eggert. Your Honors, good morning. My name is Rob Eggert, and I represent Mr. Lucas. Your issue is the sentencing issue. That is correct. Thank you. If each of you would frame that, it would help. There are a lot of moving parts in this case, so we're on sentencing with Mr. Lucas. Thank you. Right. We're on his resentencing after remand from this court, and we're arguing that the trial court committed error. It increased by 76-fold the drug quantity attributable to Mr. Lucas, and it did that based on the testimony of Lamar Warfield, and we would submit that Warfield's testimony could not be believed by any standard, preponderance or otherwise, and because the trial court relied on Warfield to calculate quantities, that was an unreasonable, we ended up with an unreasonable sentence, a violation of his due process, and that the guidelines were calculated erroneously because of the reliance on Warfield. We'll also argue that prior to the sentencing, the trial court had already credited, concluded that Warfield was reliable and believable. Lucas' resentencing was held after Warfield testified at Hardison's trial. The trial court at Hardison's trial heard Warfield talk about Lucas' drug amounts, and I think Warfield said he was buying one to four ounces of crack cocaine a week and so forth and testified to that effect at Hardison's trial. Lucas wasn't present at Hardison's trial. He wasn't a defendant at Hardison's trial. He couldn't cross-examine Warfield at Hardison's trial. I understand the timing relationship of those cases is troubling, but wasn't the order that granted the resentencing, didn't it say that the government may introduce evidence about the scope of Mr. Lucas' individual agreement in the Rico conspiracy and instructed the district court to make any appropriate factual findings? Wasn't that our Sixth Circuit order? So in doing that resentencing, wasn't the possibility that this other evidence would be used, stated? Yes, absolutely. But the two issues we have with that, or the two problems we have with that, one, we submit Warfield wasn't believable, but two, he was credited by the trial court as to Lucas, even before he testified at Lucas' resentencing. But he did testify again at Lucas' resentencing. He did. And I assume that a lot of the same questions were asked. Well, maybe so, Judge, but during that resentencing, I say we. I heard, Mr. Lucas heard, so much of what he says referring to Warfield is consistent with what he said at trial. We couldn't cross-examine him at trial or again. Well, you keep mentioning that, but the district court at the resentencing didn't rely on the trial testimony, did they? They relied on Mr. Warfield's testimony before the trial court where that district judge was making credibility determinations and determining whether or not what Mr. Warfield said was believable, correct? I think he came in saying he's believable because he said he was fairly consistent. And then he kept saying that. And the standard is only preponderance. He couldn't find him consistent until he testified in the hearing. So that was an assessment he made at the resentencing hearing. Your Honor, I did the sentencing. Based on something he said earlier. Completely based on what he said earlier. But what the judge was saying is that he's consistent. And so it's not that he believed the earlier testimony. It's that making the observation that this witness is what he's saying today is consistent with what he heard before. Well, I'd answer it this way. Burks' sentencing was the day before. At Burks' sentencing, Warfield came up with an amount off the charts that Lucas and Burks had a kilo a week. And the court suddenly said that was inconsistent, totally inconsistent. He wasn't going to accept it. So this idea that he was always consistent wasn't correct to begin with. Because the day before, the same judge said he wasn't consistent. Yet when Lucas came in, we just hear, I've heard it all, I've checked my notes, and I find him credible. And even with that, he said at the sentencing hearing, barely found Warfield credible. Barely. And he wasn't credible, we would respectfully submit. He says from 2011 to 2012, you know, six years, the team of Lucas and Burks sold him Warfield drugs. The problem with that is that Burks was in jail from 2015 on. He was in custody. He couldn't have done that. It was impossible. And then when that happened, the trial court said, well, okay, maybe there were sales, though, communication from jail. There was no evidence of that. None.  Then when he was caught in that untruth, Warfield switched and said, well, I kept buying from Lucas. But the problem was that Lucas was also in jail for a period of time, 2013 to 2014, I think 60 days, two months, never mentioned that. He also had proffers previously. I'm struggling with the legal concept that you can rely on. I know there's discussion of a lien and a primdy, but doesn't our Cooper case, I believe it is, make a distinction there? Doesn't it stand for the proposition that judge-found facts that trigger a higher sentence under the guidelines don't run afoul of a primdy and a lien because they don't change the defendant's statutory sentencing range? So how can you use those as a vehicle to claim that there's been a legal problem? Your Honor, again, we argue that Warfield, it was an error to rely on Warfield, but regarding your specific question, all the fact-finding that the court did really went to drug quantities, was more as to count two rather than the scope as to count one, the RICO. They just put on Warfield who was throwing out figures. They never connected whatever my client was doing to the RICO count in count one. They never showed that that was part of a GD trafficking as opposed to just Burks and Lucas trafficking. You don't say that there is a legal problem with a resentencing that may actually enhance the sentence. We understand it's problematic, but it is not unheard of. Well, but in count two, the drug trafficking, there was a finding by the jury, and the finding as by the trial court was way greater than that, and that's where your printing problem, I think, is. It increased it exponentially and increased, if that had all been then, increased mandatory minimums. He found way more than the jury did on count two, and way more, and he did that. The remand was for scope, respectfully. There was no evidence that my client, they had to show these sales, even if you believe Warfield, had to show that these sales were part of and the scope of the conspiracy. That was the remand, and they never put on evidence like that. They never showed it. I think your time is up, but you will have your two minutes. We believe Warfield wasn't believable. I'm sorry. Are you saying that the remand, the purpose of the remand, was for the government to show that he was part of the conspiracy, that it wasn't to address the drug quantity? They had to show the scope in count one, the scope of the agreement and the drug trafficking, not just that he sold more drugs, but, for example, was he part of something where they only sold to GDs, and was he doing it as a GD because he was a GD for the GDs, or was he just a GD who was selling drugs to many people, not just GDs? That was literally, I think Justice Boggs talked about the scope, and there was no distinctions or findings made as to the scope. They just put on a bunch of evidence about more weight from Warfield. Anything else? Thank you.  Thank you. Good morning, Your Honors. May it please the Court, Luke Evans on behalf of Brandon Hardison. The issue that I have before you this morning arises out of Mr. Hardison's separate trial from the other gangster disciple defendants, specifically attacking his convictions for by-car murder of Amanda Way and Derek Sheridan and the preceding 924J counts upon his conviction. It's our position— I want to be sure I understand how this plays out. Your arguments are about the Viker convictions, I think. Am I right? Count 2, 3, 4, and 5? And wouldn't Hardison's convictions and sentences on count 1 and count 4, which are for life imprisonment and concurrent 20 years imprisonment, don't those remain undisturbed? Or am I misunderstanding? So, Your Honor, it would be our position that, based on the matter before the Court, his conviction for count 1 and the sentence for count 1 would remain undisturbed. Counts 2, 3, 4, and 5, which would be the life sentences for the two Viker murders, as well as the consecutive 10-year sentences for the 924Js, under our position, would be vacated. But count 4, for life imprisonment, and the concurrent 20 years imprisonment, would remain also? No, Your Honor. Okay. So, what would be left of prison sentences for Mr. Hardison if you were successful on counts 2, 3, 4, and 5? So, Your Honor, and I may have— Four falls in with what you successfully did. So, Your Honor, the only other sentences that would remain intact would be the life sentence under the RICO, count 1, conspiracy, and the 20-year sentence, concurrent sentence, for the Viker assault on— and I can't remember the gentleman's name, but there was a Viker assault conviction. And so how practically would that end up reducing your client's prison time? From a practical effect, he would still be subject to a life sentence. A life sentence. Does it make any difference in where he's placed in a prison facility that he's had a Viker or not had a Viker conviction? I haven't researched that specifically to have that prepared for Your Honor, but I do believe it would affect classification without the murder convictions tagging along with part of his classification process with the Bureau of Prisons. That's helpful. Go forward with your— Yes, Your Honor. Essentially, what we have here, Your Honor, is a situation where the convictions in this case, there was not sufficient evidence to establish that the Main Street murders were in fact Viker murders, that they did not qualify under the purpose element of Viker for maintaining or increasing his position in the— I'm having trouble hearing you. Can you stay closer to the mic? Oh, yes, Your Honor. Thank you. That those convictions should be vacated because there was insufficient evidence that they were done as part of the purpose element of Viker to maintain or increase his position in the organization. That's a tough standard. That's the Jackson standard. You've got to view it in the light most favorable to the government. What makes yours able to overcome that review standard? Well, several reasons, and I can see that standard. What we have here, Your Honor, is especially in looking at this court's opinion of Ledbetter, this case falls under the category of even more in the not gang-related category as Ledbetter. Ledbetter was a spontaneous murder of a drug dealer during a drug robbery where this court found that's not sufficient. In this instance, when you look through the facts that were adduced at trial, the government's facts as adduced at trial, this was an unrelated $80 drug debt. The drug dealing was in no way connected to the gangster disciples. His act of killing the two individuals, according to the government, would have led to his potential death himself because he was facing eradication by the gangster disciples. And he would have known that as a gangster disciple member for killing Sheridan, who was another gangster disciple member, without express authorization from the organization, that Hardison himself would have faced eradication by the gang. It's absolutely illogical to argue, therefore no rational prior fact could have concluded that that sort of a step would be to maintain or increase your position within the organization. I hear you making a logical argument, but didn't he also make some statements, something along the lines of wanting to be famous, to get involved in security, specifically with the gangster disciples? I understand that he was part of the gangster disciples already, but maybe not affiliated with this group at first. But didn't he make these statements about wanting to be known as a security guy and to be famous? So, yes, Your Honor, he specifically made statements not close in time to the event, but earlier. Could a jury not make some inferences based upon those statements? Well, the statements were specifically he wanted to be famous for rapping and murder, but they were not necessarily tied to the organization itself. And so that in and of itself being a goal of his, a stated goal of his, as the proof shown now, doesn't qualify it under Vicar. If it had been, you know, like Odom or Woods, there's other cases where this court has recognized Vicar applied, there's got to be some hook to tie it to the organization. And I'm not saying in Odom or Woods there was a specific statement tied, but I believe it's the Odom case where I think the court's essential finding rested on the fact that this person was protecting another gang member. He went to the gang after the fact and said, hey, I did this to protect someone else. He reported it almost to say, you know, hopefully you'll consider me for advancement in the organization. So are those the only circumstances that we should consider in determining whether or not there's some connection? For instance, here we have him carrying out this murder and the presence of two GD members. Does that have any play here? Well, it doesn't, and this is why. So there was only one gangster disciple member present at the Main Street house, Traverse Trotter. The other was Daniel Dallin, who had some interactions with Mr. Hardison prior to, neither of which knew that there was any murder that was going to take place. Traverse Trotter's testimony was that he was under the impression that he was going just to provide the address of Mr. Sheridan and had no idea that there was going to be a murder. There was no advanced indication, as some of the other cases talk about, like I think it's Woods talks about, that the act is done at the bequest of another gang member. The other two individuals in the car in this instance were non-gang members, and they just picked up Mr. Trotter and brought him along and then after the fact, Mr. Trotter reports it back as a violation, as something that should not have happened. Wait, you said Trotter wasn't a gang member? No, Trotter was a gang member. Oh, okay. There was two other, Lavelle Traylor was in the car, who was a non-gang member, and Josh Harris was in the car, who was a non-gang member. Why is this not like Odom? The difference here is I think in Odom, if my memory serves me, that's the motorcycle gang case. At the end of Odom, the issue is that the person takes an act to protect a gang member. Another gang member? Another gang member that was spontaneous in the moment and after the fact goes to the organization and reports this as, almost with pride going, hey, look, I did this for the gang. In this instance, they essentially put Hardison on trial within the gang and they were on the verge of killing him for this. This was absolutely done in contradiction. Do you have another question? He offered two explanations. I think one was he owed him $80 for some marijuana or something, and the other one is that he felt disrespected by the fact that he greeted him with a weapon at the door. So isn't that enough to relate it to the gang, in the sense that he felt disrespected as a gang member? Well, I don't think the explanations that were, those two explanations rise to that connection. He felt disrespected, kind of hard stop. It doesn't go on to say, I mean, disrespected specifically because he did something in contravention in that moment to him as a gang member. Now, there's references in the record that he says he put it on the boss. That's a reference. Put it on the boss, like he had borrowed the money or took the money or owed the money to Hardison that Sheridan had and that Sheridan essentially put his oath of the gang that he would pay him back. And so when he's explaining this Hardison later to the gang members, when he's having to explain his actions, he says, he owed me $80 and he had put it on the boss to let the other gang members know that he had put his oath up because they were confronting him about killing another gang member. And so there's a tie to the gang there. That's the only arguable tie. And that's an explanation after the fact. This was a spontaneous act in the moment, not carried out for the gang, by the gang. The drug dealing, the $80 debt had nothing to do with the gang. And it's clear in the record from the government's witnesses that Mr. Hardison's drug dealing, those proceeds were not provided to the gang. He was not dealing drugs on behalf of the gang. You'll have your two minutes. Thank you. Thank you. Good morning, Your Honors. May it please the court. Javier Sinha on behalf of the United States. I'll be arguing Mr. Burks and Mr. Lucas' appeals. And I'll begin with Mr. Burks' appeal. I'm sorry. Can you please stay closer to the mic? Absolutely. Sorry about that. I'll begin with Mr. Burks' Batson claim. As this court recognized, this court reviews the district court's Batson determinations for clear error with great deference. And I'd like to quickly begin by just mentioning one point about the record, which is that the government actually asked every juror this question. Because after it asked Juror 1 if she would require the government to prove away speculative doubts, and she had said yes twice, the government then said to the rest of the veneer pool, is there anybody else here who would require this? And that's when the district court stepped in and said, I'm going to instruct the jury later. Does any juror believe they can't follow my instructions? And so that's a bit of a factual note to make here in regards to Mr. Burks' argument. Other than that, Your Honors, there's no clear error here. The district court found that the government's reason was unquestionably race neutral. It found that comparative juror analysis favored the government, because Juror 1, unlike other jurors, indicated that she might require the government to prove away speculative doubts. And of course, as the district court noted, there was no pattern of racial strikes here, and there was African-Americans on this jury. How many African-Americans were on the jury? It's not clear from the district court statement. Multiple, but it's not clear how many, Your Honor. If there are no further questions on Batson, I'm happy to move on to Mr. Lucas' procedural error claim on his sentencing. What about the severance claim? I'm struggling with the fact that he asked for a severance over and over and over, and perhaps at the fourth or fifth, I can't remember where he was, time, he didn't renew it. I don't understand why that would be governed by our standards. I know that we do have some cases that talk about a severance motion will be deemed waived if it's not removed. We also have a whole lot of other cases that just apply plain error review. Isn't that where we are here? I think this case can be reviewed with plain error, and even if on plain error review, we would still win on severance for the reasons we discussed in our brief. We could have essentially tried this case exactly the same way had Burks been tried alone, because this was a RICO drug trafficking conspiracy case. In any event, as this court recognized in Mr. Lucas' first appeal, the limiting instructions here that each juror should consider the evidence against each defendant individually, we know the jury followed that instruction because the jury found not guilty for some defendants and found different drug amounts for others. So even on plain error, Your Honor, we would think on the merits we win on that issue. If there are no further questions, Your Honors, I'm happy to move on to Mr. Lucas' claim about procedural reasonableness. The credibility of a witness at sentencing is a fact-finding review for clear error, and again, this court grants district courts great deference in reviewing witness credibility determinations. Here, the court found that Warfield was credible. His testimony given at sentencing hearing was consistent with the PSR, and the district court found that Warfield's testimony was also consistent with his testimony at the Hardison trial. There's no clear error there, Your Honor. And I'll also go on to the Apprendi and Allene issue. As this court sort of recognized before, Apprendi and Allene only apply when the judge's fact findings change the statutory, mandatory, or minimum. That's not what happened here. The judge's findings only affected the guidelines range here. So there's no issue in the judge making fact findings on that point. Your Honors, I have— So he concedes that it doesn't fit neatly within Apprendi or Allene, but he still says the way this—I guess we would say the way this came down, the timing and the scheduling felt very much like the sort of thing that is inappropriate to have—to use the different information from a prior hearing and to use that then as the vehicle to substantially increase his sentence. So the government didn't use his prior testimony to increase his sentence. He used his testimony at the sentencing hearing itself. So Mr. Warfield came to— Sure, but he could use it at the sentencing hearing itself because he was able then to say this is consistent with your prior testimony. So you are giving us valid information that can be used at resentencing. The district court under 18 U.S.C. 3661, under the Supreme Court and this Court's president, can consider a large amount of evidence at sentencing. The rules of evidence don't apply there, and evidence that's reliable is available to the district court here. So I think it's reliable for a district court to consider evidence— or excuse me, testimony from a previous witness at a previous trial to determine his or her credibility. I think it's quite common, and I think district court can't— Be careful what you ask for. Counsel said that the purpose of the remand was to address the scope of the conspiracy, and then it turned into a quantity dispute. What do you say about that? I respectfully disagree with, I think, my friend on the other side's reading of this court's prior opinion. I think this court's remanded for the judge to make a finding about the quantity of drugs itself. That's what Mr. Lucas complained about in his first appeal, and this court said that on remand, the government could provide evidence of drug quantity to show his drug quantity here. And so I don't think this court only said to consider the attachment or the connection between the drug amounts and the conspiracy. Just to get a little clarity there, I want to make sure that I understand. So are you saying that the scope was not at issue on resentencing and it was only drug quantity? Sorry, so no. So what happened in the first appeal was that the government— or excuse me, the district court did make a finding about Mr. Lucas's actual drug amount. It just adopted the jury's finding. So this court said if the district court wants to adopt drug quantities from his co-conspirators to attribute to Mr. Lucas, the district court has to make a finding about the agreement Mr. Lucas had with those co-conspirators for that drug amount. The district court here focused on the personal drug liability of Mr. Lucas by looking at the drug sales he personally made. So it took a conservative estimate of Lucas's drug quantity here by focusing on what drug sales Mr. Lucas actually made himself. Your Honors, if there are no further questions, I'm happy to rest on our briefs. Thank you. Thank you very much. Good morning. Excuse me. Good morning, Your Honors. And may it please the court, I hope you're able to hear me. I'll keep the microphone close. Michael Rotker from the Department of Justice on behalf of the United States, and I'm representing the government in connection with Mr. Hardison's appeal, challenging the sufficiency of the evidence. Two observations. I'd like to make one procedural and then one substantive. Judge Strange, you were asking questions about the practical impact. I think your question was getting at sort of the concept of a concurrent sentence doctrine that maybe the court doesn't need to necessarily reach the issue because at the end of the day, he's still going to have a life sentence on count one. Of course, the concurrent sentence doctrine, the Supreme Court rejected that in the case called Ray from 1987 because he has a special assessment on each count. So the court is not at liberty to sidestep his substantive claims on the theory that it wouldn't make a difference to his sentence because of the special assessment. So, you know, we do think that the issues are fairly in play, although the practical significance is certainly mitigated. If the court has no questions. One other quick question. Does it make a difference to where he is incarcerated and what level of security he is subject to at a facility? I don't know the answer to that, Your Honor. I would guess, and I'm happy to submit something if the court would like me to, but having a life sentence on a RICO count, I think it's based on the statutory maximum for the crime. And so having a life on one versus three, I wouldn't think it makes a difference, but I can't speak authoritatively because it hasn't been presented. That's helpful. Your Honors, on the merits of the question, again, Judge Strange, as you pointed out, the Jackson standard is obviously a deferential standard. The court, like the district court below, has to look at the evidence in the light most favorable to the jury's verdict and not only the evidence but also reasonable inferences to be drawn from the evidence. And we freely acknowledge that in this case there were two competing narratives presented to the jury as to what the motive was for this crime. In the government's view, Mr. Hardison was trying to brandish and burnish his credentials as a violent enforcer, that he was standing up for the gang's lack of tolerance of disrespect, and that he was. He made statements to Dowland and others before the murders that he wanted to use his violent propensity both to better the gang but also to further his own ambitions to climb the ladder. And I'm referring, Judge Davis, as you pointed out, to his comments about wanting to be famous for rapping, for murder. His belief that the disciples could help him achieve that level of fame. And then there were specific testimony and specific statements attributed to Hardison where he said, I want to be on the enforcement squad. I want to be on the blackout squad. Okay, so that's the sort of foundational evidence for the government's narrative. And then, of course... So he wants, he clearly wants fame. And he clearly thinks that rap or murder is going to be a vehicle to get there. Correct. But Viker has a very specific requirement of proof. It has to have been the animating purpose of the defendant's action to maintain or increase his position in the racketeering enterprise. I guess just to say, kind of practically, what if the guy's just crazy and he wants to be, and he is a violent human being, and he wants to be famous? Of course he wants the gang to make him famous too.  But the question is, does this fit within the parameters of what Viker requires to be, or is this a guy who would kill for the gang or kill for publicity? He just didn't care. Well, whatever, that's exactly the point, is that there were two competing narratives presented to the jury and that the defense theory was that he just didn't, this was just over a drug dispute. It had nothing to do with the gang. But you have to show that the gang itself, promotion... Maintain or increase. Yes, and push his position. That's your burden. Correct. How do you fit within our precedent? Sure. We've got Woods, we've got Odom, all of those have different factors that are not impacted here. Right, and all these cases have different fact patterns. It's obviously a fact-intensive question. The question, as Your Honor said, is whether or not it was an animating purpose. And there are two points to keep in mind. Number one, this court has said in Hackett and Woods and Odom, it doesn't need to be the sole or exclusive purpose. On the other hand, it has made clear that just being a member of a gang alone, somebody who commits a violent crime and happens to be a gang member, doesn't automatically satisfy Viker's motive. It has to be an animating purpose. And here, where you have testimony from Mr. Hardison, his own statements, that not only did he want to be famous, not only was he willing to commit murder, but he was doing so, he wanted to do so, because he believed that he deserved a coveted position as an enforcer. Right? And then you have those statements. Then you have on the night of the murder, he goes out to Sheridan's house, he tries to collect the drug debt again, he's rebuffed again. Sheridan's holding a gun, disrespecting him. Hardison, consistent with the gang's values, right? The gang, as the district court said and as this court has acknowledged in prior opinions, the gangster disciples do not take disrespect lightly. And so someone who's ambitious and who wants to climb the ladder, he's going to respond. But here's the distinction. The guy he's killing and the fiancé or romantic partner of the person, Wayland, I think, is they are part of the gang.  Well, Sheridan was, right? Sheridan's status as a gangster disciple was never vindicated. He claimed that he was, but he was not on count. He didn't go to meetings. It's not at all clear. But he claimed that he was. Yes. And so what we have is someone who, your claim is that he wants to move up position in that organization. Right. But he's got to understand that killing another gang member will lead to you being eradicated, put to death for that action. And that was, yes. And that was, well, that was a risk that he took. But these gangster disciples' principles sometimes come into conflict, right? I mean, the idea is, on the one hand, there's a risk that if he does something, he could be eradicated, sanctioned, smashed, beaten by the gang. On the other hand, he's trying to vindicate the principle that we don't take disrespect lightly. Is the proof that he was trying to vindicate the principle that our gang does not take disrespect, or are his statements, he disrespected me? Well, I think the statements were that Hardison himself felt disrespected. But disrespect is also consistent with the gangster disciple's philosophy, okay? So it's not just that Hardison felt disrespected. But the reason for the disrespect is because the disciples don't stand for disrespect. It's not just him personally. But I think a jury could infer that's consistent with the gangster disciple's mantra. He is a gangster disciple through and through. He is, as the district court colorfully said, he's a card-carrying, lifelong member with tattoos, you know, of Larry Hoover and six-pointed stars. I mean, this guy, all he knows— Help me understand Viker's reach. So then if you have a member of the gangster's disciples, and he goes out somewhere to a dance, like this guy was a dancer, obviously, and goes outside and somebody smarts off to him, he just pulls out his gun and shoots him dead. Is that under Viker? No, I think that's more like a Ledbetter-type situation, right? Where you have—just because someone's a gangster and they commit a crime doesn't bring it into Viker. But this is a very different case. There's much more evidence. Let me, if I may, just quote. You have a district court judge, Judge Crenshaw, here, who presided over this sprawling indictment with many defendants. He presided over many trials. In going back and preparing for the argument, rereading his post-verdict memorandum, I think he absolutely got it exactly right. And the critical quote—and this is R-2095, the page ID number is 27841— he recounted the Jackson Standard, and he said, Viewed through the prism of Rule 29, the government presented more than enough evidence from which a reasonable jury could conclude that the animating purpose behind Hardison's murder of Sheridan and Weyand was to maintain or increase his position with the disciples. The court then walked through the evidence, and it specifically addressed Ledbetter. Well, that's a conclusion. That's the legal conclusion. And then what I'm saying is the court then walked through in great detail— that was my point—the next three or four pages, the court walked through all the evidence and said, Look, yeah, I acknowledge the evidence was conflicting, but that's the whole point. The question— I'm trying to say it's different from the gang member who feels disrespected at a dance who wants to make the point that we don't give you a pass when you disrespect us. So if that's what he was doing here, you say it's very different, but why is it different? Because he made statements about his aspirations, about his willingness to commit murder, and he made specific statements about his desire to use the gang and the violence that he brought to the table to further his own motives and move up the ladder. I'm sorry. We are assuming that in both cases, the reason he commits the murder is because he feels disrespected.  He is a gangster disciple. Yes. And gangster disciples don't accept that. Right. And he's an enforcer. Right. And that's why he shoots the guy. Well, he wasn't an enforcer. That was exactly the point. The motive, the animating purpose, was to become an enforcer, to get placed on the security squad, to get placed on the blackout squad, which, by the way, after the murder happened. And I think that is confirmatory of what his motive was.  Wasn't the testimony that they came together to decide to eradicate him? Yes. And then I've forgotten the gentleman's name who took up his cause. Yes. And convinced him, no, we're not going to kill this guy. We're going to use him. Exactly. And that's why it's a jury question. That was a calculated risk that he faced. Yes. Thank you, Your Honor. That's a very nice way to put it. You know, Hardison, I realize I'm over my time. If I may just take a few more seconds. Sure. You know, the first time that the Clarksville deck encountered Hardison, he's at a club throwing up the pitchforks in front of other gang members, subjecting himself to risk of serious great bodily harm at that point. So Hardison clearly knew that there were risks involved in the course of action that he chose. But, Judge Davis, yes, the calculated risk was, this was an opportunity for me to show to this Clarksville gang that I'm a tough guy and I'm an enforcer and I'm willing to shoot and I'm willing to kill and I deserve a spot on these coveted security squads. It's ultimately a jury question what the animating purpose was. The district court found the evidence was more than sufficient. I understand that this court reviews that de novo, but ultimately this court should defer to the jury's prerogative to choose between. Here's what I think we're struggling with, what Ledbetter says about racketeering and the purposes there. To find sufficient evidence would be to convert violent crimes in aid of racketeering statute into a gang status crime, punishing any and all violent crimes by gang members no matter their relation to the racketeering enterprise. Correct. The problem for me is, and I think for all of us here to try to understand that, this was a drug debt that had nothing to do with the gangsters. Understood. It was his independent business and he was selling, I think, marijuana to this fellow. Right. He came back several times and said, pay me my $80. Right. It's hard to fathom killing someone over $80. I agree, but it was not the gang's business. What Ledbetter says is that the Vicar doesn't cover that members are expected or encouraged to unilaterally rob and murder low-level drug users who otherwise support the gang by purchasing its drugs. Right. Why isn't that what's going on? Because the motive here is not the amount of money that was owed. The motive was the repeated disrespect that had been shown. It's not about killing drug dealers for killing drug dealers. It's about the fact that Sheridan put it on the BOS. He made an oath that he was going to repay, and he kept balking and refusing to pay. And at some point, Hardison, I think you can fairly say, and I think the jury could readily have inferred, he was kind of at a crossroads. Right. Because if he didn't do something, there was a risk that the gang would view him as weak because this drug debt was known to the gang. If he didn't do anything, there was a risk that they could view him as weak, and Brandon Hardison is anything but weak. So Hardison took a calculated risk on the other end of the spectrum and said this is an opportunity for me to prove my bona fides. I don't think this fits within Ledbetter because Hardison wasn't prosecuted and convicted under Vicar solely because of his status as a gang member. He was convicted because he was a gang member who used an opportunity that presented itself to prove to the gang that he was worthy of a promotion that he then subsequently received. And I think that's within the jury's prerogative to make that finding. Thank you. We appreciate your time. I appreciate the extra time, and I appreciate the court's attention. Thank you. We'd ask the court to affirm. May it please the court. With regard to the Batson issue, unless I'm wrong, which I often am, it seems to me that the crux of the issue that we're discussing here is that the district court's decision is entitled to great deference. The government argued in its briefing and then basically argued that a little more here before this court today. Yes, the district court's decision is entitled to great deference, but the government says it like, that's that. That's wrong. And we know that because of this very case. This case, Maurice Burks' case, as all of you know, came to this court previously on another issue in which the district court's decision was entitled to great deference. And this court said, entitled to great deference, but wrong. The distinction between those two issues is, in that case, the district court's decision was entered after a full briefing, months of reflection, a very lengthy written order with a long factual recitation and an intricate legal analysis. And this court said, nonetheless, it was wrong. The decision in this case regarding the Batson challenge was made after about 30 seconds of argument. It's a page and a half in the voir dire transcript. It was a spur of the moment decision. It's entitled to great deference, but unlike what the government is arguing, it is not entitled to just saying, well, that's that. Well, what about Mr. Sinha's argument or point, I guess, that the court actually did ask, excuse me, that all jurors were asked the exact same question? That's incorrect. He's correct that after juror number one gave her answer, the government started a question to the entire panel on the burden of proof issue. The district court interjected, cleaned up the language, asked an understandable question to which juror number one responded appropriately. No other juror responded. I heard the same thing you did, Judge Davis. Unlike other jurors, that's just not quite right. No other individual juror answered this question. None. The government started a question to the entire panel. No juror answered it. Juror number one was singular, targeted, and gave completely acceptable answers when asked comprehensible questions. Thank you, Your Honor. I would like to follow up on scope. The opinion from the Sixth Circuit clearly stated that the finding, without the finding by the district court, of five kilograms of cocaine and at least 208 grams of crack, were within the scope of Lucas' agreement on count one. Assigning a base level of 30 was error. And then officially reversing at the new sentencing hearing, the government may introduce evidence about the scope of Lucas' individual agreement and the RICO conspiracy. None of that was done. And I would contrast that with one of the cases that was cited, which was Keillor. That was an outlaw's motorcycle gang. Keillor was selling drugs to various people. But they pointed out, and the government was able to show in that, that Keillor was part of the bigger conspiracy. It wasn't just selling drugs himself. And that he met with drug dealers, he made drug policies, he considered placing a tax, and so forth. None of that evidence was put on to show the scope of Lucas' conduct within count one, the RICO conspiracy, as to just Lucas selling drugs based on what Warfield said. Warfield didn't even, even if one wanted to believe Warfield, he didn't even mention any of those things at all. None. So we got a remand for scope, and no evidence was put on scope, and no findings were made on scope, and there was no distinctions made between Lucas selling drugs for himself and Lucas selling drugs for the gangster disciples, which was the whole point of the remand. Finally, I would submit that I understand this trial court looking at the witness, but nobody had more baggage than Warfield. He killed and beat and smashed and was looking at multiple life sentences, and then, as he stated in Hardison's trial, he would do anything to avoid those life sentences, anything, and became a government witness. I think multiple counts of murder, he was looking at one mandatory life without beating, smashing, shootings, drive-bys. He had no choice but to do, his motive was so overwhelming, we believe he would have said anything. Thank you. Your Honors, the government is asking this court to fall into the tautological trap that Ledbetter warns against, and that is gang members' actions are gang-related because they're gang members. That's essentially what they're asking this court to do. He speaks of motive. The motive in this case is clear. The motive was personal. The motive at that moment was a personal motive based on personal disrespect, and as Hardison's statement is quoted in the record as saying, and he had me feeling some kind of way. It's a personal motive. To say that that act somehow was to seek advancement is, again, beyond the pale. I don't think anyone in history ever has, seeking a promotion, said, I'm going to commit a fireable offense because I might get promoted for it, and that's essentially the illogical, unreasonable inference that the government's asking this court to adopt, essentially rendering the concern in Ledbetter meaningless if this court were to stand by these convictions in this case. The only other specific issue I would address is about Sheridan himself, and I respectfully disagree with my colleague as it is as to whether or not it's established in the record that Sheridan was a G.D. It was clearly established in the record through testimony that he was a G.D. member, that he was not on count, but he was in fact a G.D. member, and that is exactly why the G.D. head shed met and decided initially to kill Hardison, is because he killed a G.D. member without sanction. Thank you. And I see that you are taking this case under the CJA, and we want to thank you. That is one of the things that makes our court functional, is to have people who are willing to accept these cases and come and argue and write before us. So we thank you. We think our system works better when we have good people on both sides working, so thank you for giving me your time to do that. Thank you for the court's time, and it's my honor to do so. We will take the case under advisement. And an opinion will be issued in due course. You may call the next case.